UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATHAN BURGOON, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NARCONON OF NORTHERN CALIFORNIA, et al.,<br><br>Defendants. | Case No. 15-cv-01381-EMC<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO COMPEL ARBITRATION; AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS**<br><br>Docket Nos. 25, 27 |

Plaintiffs Nathan Burgoon and Caleb Landers have filed suit against Defendants Narconon Fresh Start ("NFS"); Narconon Western United States ("Western"); Narconon International ("International"); Association for Better Living and Education International ("ABLE"); and Narconon of Northern California ("NNC"). Plaintiffs have asserted several fraud-based claims against Defendants, claiming, in essence, that representations made with respect to the drug treatment program offered at the Narconon facilities were false or misleading. Defendants moved to compel arbitration. The Court deferred ruling on the motion in order to hold a bench trial on the issue of whether Plaintiffs had the mental capacity to contract with the Narconon facilities or were unduly influenced to contract. *See* Docket No. 63 (order). A bench trial was held on January 4, 2016. In this order, the Court issues its findings of fact and conclusions of law with respect to the bench trial. The Court also rules on the motion to compel arbitration.

## I. STANDING

As a preliminary matter, however, the Court addresses an argument that Defendants raised for the first time as part their trial brief – *i.e.*, that Plaintiffs lack Article III standing. Defendants assert that neither Plaintiff actually paid a Narconon facility for his treatment (rather, Mr.

1 Burgoon's wife and Mr. Landers's father paid) and therefore they have not suffered any injury.

2     The Court is not unsympathetic to the fact that Defendants did not have the requisite knowledge to present a standing argument until now.  It was not until discovery on the mental capacity and undue influence issues that Defendants uncovered who actually paid for Plaintiffs' treatment.  Nevertheless, that does not excuse the fact that Defendants have not properly teed up the standing issue for resolution by the Court.  The bench trial was set to resolve the issues of mental capacity and undue influence, not standing.  Once Defendants uncovered a standing issue (*i.e.*, while taking discovery on mental capacity and undue influence), Defendants should have filed a motion to dismiss based on lack of subject matter jurisdiction.  Defendants did not do so, and thus the Court does not have before it full briefing on the issue.  That Plaintiffs raised new arguments at the bench trial in response to Defendants' standing argument (*e.g.*, that Mr. Burgoon's wife's money is also his money because it is community property, and that both Plaintiffs suffered economic injury because they had to pay for new drug treatment because the Narconon treatment was not successful) underscores that the Court is not in a position to make any ruling on standing.

    Accordingly, to the extent Defendants are now asking for a dismissal based on standing, the Court denies that request for relief, albeit without prejudice.  The Court now turns to the bench trial on mental capacity and undue influence.

## II.    FINDINGS OF FACT & CONCLUSIONS OF LAW

A.    <u>Legal Standard</u>

    Both Plaintiffs signed admission/service agreements with the Narconon facilities – Mr. Burgoon with NNC and Mr. Landers with NFS.  Mr. Burgoon signed two agreements:  the first on July 27, 2014, and the second on August 3, 2014.  Each agreement was signed on the day that Mr. Burgoon was admitted into the Narconon facility.  Mr. Landers signed only one agreement:  on October 3, 2014, the day after he was admitted into the Narconon facility.  All agreements contained arbitration provisions.  Mr. Burgoon not only signed his admission agreement but also initialed the arbitration provision specifically.  Mr. Landers signed his admission agreement but did not initial the arbitration provision or, for that matter, any of the other specific provisions

requiring initialization in the contract.  Mr. Landers's father both signed the agreement and initialed all specific provisions.

Plaintiffs assert that they cannot be compelled to arbitrate because they lacked the mental capacity to contract or were unduly influenced to contract.  Plaintiffs have previously conceded that they are asserting mental incapacity and undue influence with respect to the admission agreements as a whole, and not just the arbitration provisions specifically.[1]  At the bench trial (prior to the presenting of evidence), Plaintiffs reaffirmed this position upon express questioning by the Court.  Moreover, case law is in accord.  *See, e.g.*, *Spahr v. Secco*, 330 F.3d 1266, 1273 (10th Cir. 2003) (noting that, "[u]nlike a claim of fraud in the inducement, which can be directed at individual provisions in a contract, a mental capacity challenge can logically be directed only at the entire contract"); *Villalpando v. Transguard Ins. Co. of Am.*, 17 F. Supp. 3d 969, 983 (N.D. Cal. 2014) (Conti, J.) (stating that, "[b]ased on Plaintiff's irregular allegations as to exactly how much of the Agreements he understood, the Court is not persuaded that Plaintiff lacked capacity to enter just one particular clause of the Agreements[;] [t]he question of whether Plaintiff had capacity goes to the formation of the entire contract" – "Plaintiff's contentions on this issue [are] more suited for an unconscionability argument").  Thus, the issue for the Court is whether Plaintiffs lacked mental capacity or were unduly influenced to enter into the admission agreements.

The Court acknowledges that, in supplemental briefing requested by the Court after the bench trial, Plaintiffs have now adopted a different position.  That is, in post-trial supplemental briefing, Plaintiffs asserted – contrary to their earlier position – that the issue is "not whether Mr. Landers' or Mr. Burgoon's addiction or withdrawal rendered them unable to enter any contract whatsoever (for example, an agreement to buy a cup of coffee).  Instead, the question is whether they had the capacity to appreciate the purported agreement to arbitrate with the Defendants."  Docket No. 106 (Pls.' Supp. Br. at 3).  But not only did Plaintiffs clearly take the opposite position and thus waived this belatedly raised argument, they have also failed to cite any authority to

---

[1] Thus, Plaintiffs dropped their claim for breach of contract.

3

support this position. Plaintiffs fail to deal with the Tenth Circuit's holding in *Spahr*.

Under California law, "[i]t is essential to the existence of a contract" that (1) parties be "capable of contracting" and that (2) they consent to the agreement. Cal. Civ. Code § 1550. "An apparent consent is not real or free when obtained through . . . [u]ndue influence." *Id.* § 1567(4). Plaintiffs have the burden of proving that they lacked mental capacity and/or that they were unduly influenced. *See, e.g.*, *Mills v. Kopf*, 216 Cal. App. 2d 780, 783 (1963) (stating that party seeking to avoid a contract on the ground of incompetency had "the burden of proving that she was 'entirely without understanding of any kind'"); *Olam v. Congress Mortg. Co.*, 68 F. Supp. 2d 1110, 1139-40 (N.D. Cal. 1999) (stating that, "under California law the burden of proving a claim of 'undue influence' is on the claimant . . . when there is no confidential relationship between the contracting parties"); *cf.* Cal. Prob. Code § 810 (providing that, "[f]or purposes of this part, there shall exist a rebuttable presumption affecting the burden of proof that all persons have the capacity to make decisions and to be responsible for their acts or decisions").

Regarding capacity to contract, "[a] person entirely without understanding has no power to make a contract of any kind." *Id.* § 38. In addition, a contract made by "a person of unsound mind, but not entirely without understanding," may be rescinded. *Id.* § 39(a). "A rebuttable presumption affecting the burden of proof that a person is of unsound mind shall exist . . . if the person is substantially unable to manage his or her own financial resources or resist fraud or undue influence." *Id.* § 39(b).

"A determination that a person is of unsound mind or lacks the capacity . . . to contract . . . shall be supported by evidence of a deficit in," *e.g.*, information processing or thought processes, but such a deficit "may be considered only if the deficit . . . significantly impairs the person's ability to understand and appreciate the consequences of his or her actions with regard to the type of act or decision in question." Cal. Prob. Code § 811(a)-(b). [2] In other words, a person is of unsound mind or lacks the capacity to contract only when he or she is not able to understand the

---

[2] Although Plaintiffs do not agree that the California Probate Code's standard for mental capacity is applicable, they also concede that it is substantively no different from the applicable law. *See* Docket No. 106 (Pls.' Supp. Br. a 3).

nature and effect of the transaction. *See, e.g.*, *Guidici v. Guidici*, 2 Cal. 2d 497, 501 (1935) (in a case where plaintiff claimed that "at the time of signing said deed he was in such a state of mind, due to long and excessive drinking of intoxicating liquor, that he did not know what he was doing and that he had no recollection of signing the deed," stating that evidence "was sufficient to support the finding of the trial court that the plaintiff at the time of the execution of said deed was mentally incapable, due to the protracted and excessive drinking of alcoholic liquors, of understanding the nature of his act in the signing and execution of said deed"); *Hellman Commercial Trust & Sav. Bank v. Alden*, 206 Cal. 592, 603 (1929) (indicating that "'[t]he mental incapacity to avoid . . . a contract must amount to an inability to understand the nature of the contract and to appreciate its probable consequences'"); *Smalley v. Baker*, 262 Cal. App. 2d 824, 832 (1968) (stating that, "[]n California, as in many states, a party is entitled to rescission of a contract if, when he entered into the contract, he was not mentally competent to deal with the subject before him with a full understanding of his rights, the test being, in each instance, whether he understood the nature, purpose and effect of what he did").

Regarding undue influence, such exists when one takes "an unfair advantage of another's weakness of mind" or "a grossly oppressive and unfair advantage of another's necessities or distress." Cal. Civ. Code § 1575. Factors to consider in assessing undue influence include the following:

> (1) discussion of the transaction at an unusual or inappropriate time, (2) consummation of the transaction in an unusual place, (3) insistent demand that the business be finished at once, (4) extreme emphasis on untoward consequences of delay, (5) the use of multiple persuaders by the dominant side against a single servient party, (6) absence of third-party advisers to the servient party, (7) statements that there is no time to consult financial advisers or attorneys.

*Odorizzi v. Bloomfield Sch. Dist.*, 246 Cal. App. 2d 123, 133 (1966).

B.   Mental Capacity

    1.   Findings of Fact

       a.   Mr. Burgoon and Mr. Landers each had the mental capacity to enter into the admission agreement with the relevant Narconon facility.

5

      b.     Neither Plaintiff made the claim that he did not know that he was signing an admission agreement.

      c.     Both Plaintiffs, in fact, knew that they were at the Narconon facilities to receive drug treatment, that they were consenting to such treatment, and that the facilities would have to be paid for giving treatment.

      d.     Thus, both Plaintiffs were able to understand the nature and effect of the admission agreements.

      e.     Plaintiffs' assertion that they were extremely high and/or suffering severe withdrawal symptoms which rendered them mentally incapable of contracting is not supported by the evidence.

      f.     The testimony of Jesse Quaid that Mr. Burgoon was coherent on July 27, 2014, when he was first admitted to the facility, is credible. Notably, at that time, Mr. Burgoon had sufficient faculties to ask questions about the terms of admission (*e.g.*, the no refund policy) and what a stay at the facility would entail (*e.g.*, the phone policy).

      g.     Mr. Burgoon claims that he shot up heroin multiple times on July 27, 2014, before being admitted, but the tests run by the Narconon facility did not show heroin in his system. While Mr. Burgoon claims that the tests must be mistaken, he has provided no evidence to establish or support such. Nor was his testimony that he shot up six times on his way to the facility credible.

      h.     Mr. Burgoon did not begin to suffer severe withdrawal symptoms until the day *following* his initial admission, *i.e.*, on July 28, 2014. These symptoms led to Mr. Burgoon's being referred to a different facility so that he could obtain medical assistance with the withdrawal. But notably, even these symptoms did not prevent Mr. Burgoon from filling out a fairly detailed health questionnaire (albeit with some help) on July 28, 2014. *See* Ex. 24.

      i.     The testimony of Mr. Quaid that Mr. Burgoon was coherent on August 3, 2014, when he was readmitted to the facility, is also credible. Notably, Mr. Burgoon was able to provide answers to a detailed health questionnaire on the preceding day. *See* Ex. 342. Furthermore, the medical records indicate that Mr. Burgoon was in a much improved state by August 3, 2014. And

6

that Mr. Burgoon had his faculties about him is further demonstrated by the fact that he purposefully began to lie to and manipulate facility staff in order to get out of the detox part of the treatment and into the "regular" program (*e.g.*, lying about his sleep and eating). He also admitted to lying to his wife to manipulate her.

j. Based on the above, Mr. Burgoon's testimony that he was extremely high and/or had severe withdrawal symptoms, either on July 27 or August 3, 2014, is not credible. Furthermore, as a general matter, Mr. Burgoon's credibility is questionable. Mr. Burgoon completely recanted a significant part of the declaration that he previously submitted (under penalty of perjury) in conjunction with the motions to compel arbitration. *See* Docket No. 32 (Burgoon declaration). Mr. Burgoon now admits that he was not harangued by staff on August 3, 2014, when he signed the second admission agreement. Instead, he now admits that alleged haranguing did not take place until two days later, when he tried to leave the facility, an admission squarely at odds with his prior declaration under oath.

k. As to Mr. Landers, the testimony of Tiffany Bogart that Mr. Landers was coherent on October 3, 2014 is credible. Like Mr. Burgoon, Mr. Landers was able, with some assistance, to provide answers to a detailed health questionnaire on October 3, 2014 (the day that he signed the admission agreement). *See* Ex. 46. Moreover, that same day, Mr. Landers was evaluated by a third party, Daniel Elliott of Inland Urgent Care, and his assessment of Mr. Landers was that he was, in effect, normal. While Mr. Landers was a more credible witness than Mr. Burgoon, his specific testimony as to the severity of his withdrawal symptoms at the time of admission and the day thereafter is not credible. It is not consistent with the medical records and testimony of others, including a third party, Mr. Elliott, who were credible.

l. The testimony of Plaintiffs' expert, Dr. David E. Smith, is largely irrelevant. Dr. Smith opined on Plaintiffs' ability to understand "complicated" arbitration provisions. Smith Decl. ¶ 13. He did not opine as to Plaintiffs' capacity to understand the nature and effect of the admission agreement. As discussed above, it is not Plaintiffs' understanding of a specific contract provision that is at issue; instead it is their capacity to contract for admission.

m. Dr. Smith's testimony about drug addiction is not on point. The fact that Plaintiffs,

7

1  as drug addicts, may have had poor impulse control simply that they were likely to make bad
2  choices, but controlling impulses and exercising bad judgment are a different matter from the
3  ability to understand the nature and effect of their action in consenting to the admission
4  agreements – they understood they were to get drug treatment from the Narconon facilities as part
5  of the agreement.

      n.     Plaintiffs have not credibly established any other basis for lack of capacity to contract.

      2.     <u>Conclusions of Law</u>

      a.     Plaintiffs had the mental capacity to enter into the admission agreements with the Narconon facilities.  Even if Plaintiffs were high from drugs and/or had high-level withdrawal symptoms, that does not negate the fact that they knew they were seeking drug treatment from the Narconon facilities for which the facilities would have to be compensated, and thus understood the nature and effect of the admission agreement.

C.     <u>Undue Influence</u>

      1.     <u>Findings of Fact</u>

      a.     Because Plaintiffs' claims of undue influence are predicated on their having a vulnerable state because of their drug use and/or withdrawal, the factual analysis above is largely applicable here.

      b.     As to Mr. Burgoon, he has admitted that he was not harangued on the day that he was readmitted to the Narconon facility.

      c.     As to Mr. Landers, the Narconon facility may have been persistent in asking Mr. Landers to sign the agreement but, notably, each time he declined, the facility staff member respected those wishes.  Mr. Landers did not sign until he was ready to sign.  Thus, there was no overpersuasion by the facility.

      2.     <u>Conclusions of Law</u>

      a.     Neither Plaintiff was unduly influenced to contract in signing the admissions agreements.

### III. MOTIONS TO COMPEL ARBITRATION

Because the Court has found no mental incapacity and no undue influence, Plaintiffs' contention that they cannot be compelled to arbitrate based on mental incapacity and undue influence are without merit.

Plaintiffs have still argued, of course, that arbitration should not be compelled based on an independent reason, *i.e.*, unconscionability. Under California law, unconscionability has two components: procedural unconscionability and substantive unconscionability. *See Armendariz v. Found. Health Psychcare Servs.*, Inc., 24 Cal. 4th 83, 114 (2000) (stating that both procedural and substantive unconscionability must be present "'in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability'"). "But they need not be present in the same degree. . . . [T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.*

The Court finds some level of procedural unconscionability (albeit low) in each Plaintiff's case. Although Plaintiffs' use of drugs and/or withdrawal did not affect their mental capacity to contract, it did make them more vulnerable. Also, the arbitration provisions were somewhat embedded in the admission agreements (*i.e.*, not prominently displayed). Finally, as the Court previously noted, the admission agreements are akin to contracts of adhesion, "notwithstanding the fact that, in Mr. Landers's situation, his father was able to reduce the price of admission to some extent." Docket No. 63 (Order at 16).

The Court also finds some substantive unconscionability, for example, with respect to (1) the statute-of-limitation provision in Mr. Burgoon's contracts, *see Newton v. Am. Debt Servs.*, 854 F. Supp. 2d 712, 732 (N.D. Cal. 2012) (finding objectionable the arbitration clause that "shortens the statute of limitations"); (2) the confidentiality provision in Mr. Landers's contract, *see Mohamed v. Uber Techs., Inc.*, No. C-14-5200 EMC, 2015 U.S. Dist. LEXIS 75288, at *108 (N.D. Cal. June 9, 2015) (noting that, in *Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003), the Ninth Circuit held that "a broad confidentiality provision in an arbitration agreement is substantively unconscionable under California law"); and (3) the cost-splitting provisions in both Plaintiffs'

1  contracts.[3]  *See Ting*, 319 F.3d at 1151 (noting that agreement required cost-splitting of arbitrator

2  fees and stating that " the scheme is unconscionable because it imposes on some consumers costs

3  greater than those a complainant would bear if he or she would file the same complaint in court").

4  Defendants have relied on *Kilgore v. KeyBank National Association*, 718 F.3d 1052 (9th

5  Cir. 2013), to argue that the cost-splitting provision is not substantively unconscionable, but, in

6  *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916 (9th Cir. 2013), the Ninth Circuit explained that,

7  in *Kilgore*, it simply "held that the mere risk that a plaintiff will face prohibitive costs is too

8  speculative to justify invalidating an arbitration agreement." *Id.* at 925-26.  In *Charavarria*, there

9  was "nothing speculative" about the cost provision under consideration which "requires that the

10  arbitrator impose significant costs on the employee up front, regardless of the merits of the

11  employee's claim, and severely limits the authority of the arbitrator to allocate arbitration costs in

12  the award." *Id.*  The cost provisions in the case at bar are similarly nonspeculative in that they

13  provide that the cost of arbitration shall be split amongst the parties, with no contemplation of

14  allocation by the arbitrator in his or her discretion.

---

[3] The Court notes that, in their papers, Plaintiffs have referenced the cost of arbitrating in a forum that is not their hometown.  Plaintiffs, however, have not directly raised an argument that the forum selection clauses in the admission agreements are substantively unconscionable.  Because Plaintiffs have not directly raised the argument, the Court does not make any ruling on it.  The Court notes, however, that there appears to be a significant weakness with such an argument.

For Mr. Landers (a resident of Forksville, Pennsylvania), the contract provided that the forum would be Los Angeles County and, for Mr. Burgoon (a resident of Arcata, California), the contracts provided that the forum would be Santa Cruz County.  *See* Farnsworth Decl., Ex. 1 (Agreement at 12); Quaid Decl., Exs. A-B (Agreements at 9).  Both fora are close to or are where the NFS and NNC facilities are located where Plaintiffs sought treatment (San Diego County and Santa Cruz County, respectively).  Thus, it would be difficult to say that the selection of the forum was one-sided or unreasonable.  *See Bolter v. Superior Court*, 87 Cal. App. 4th 900, 910 (2001) (stating that company's "prohibition against consolidation, limitation on damages and forum selection provisions have no justification other than as a means of maximizing an advantage over the petitioners"); *see also Am. Online v. Superior Court*, 90 Cal. App. 4th 1, 12 (2001) (stating that "[o]ur law favors forum selection agreements only so long as they are procured freely and voluntarily, with the place chosen having some logical nexus to one of the parties or the dispute, and so long as California consumers will not find their substantial legal rights significantly impaired by their enforcement").

Defendants have also relied on *Gutierrez v. Autowest, Inc.*, 114 Cal. App. 4th 77 (2003), to argue that, where a consumer action is at issue (as opposed to an employment action as in *Armendariz*), a court must evaluate a cost-splitting provision on a case-by-case basis – *i.e.*, such a provision is not deemed automatically substantively unconscionable but depends on whether the cost of arbitration actually exceeds the consumer's ability to pay. *See id.* at 96-97 (acknowledging that *Armendariz* "'categorically imposes costs unique to arbitration on employers when unwaivable rights pursuant to a mandatory employment arbitration agreement are at stake'" but declining to take that approach in the consumer context; "[t]he determination that arbitral fees in consumer cases are unreasonable should be made on a case-by-case basis, with the consumer carrying the burden of proof"). As a preliminary matter, the Court notes that there is tension between *Gutierrez* and the Ninth Circuit's decision in *Ting*. Although there are differences between the employment context and the consumer context (as the *Gutierrez* court noted, *see id.* at 97-98 (stating that "[c]onsumers, who face significantly less economic pressure[,] would seem to require measurably less protection"; also taking note of California Code of Civil Procedure § 1284.3(b) which did not adopt a categorical approach in favor of consumers in consumer arbitrations)), a fair argument may be made that *Ting* is the better authority because there is language in *Armendariz* suggesting that its analysis extends to any unwaivable statutory right, and not just an employment right. *See, e.g.*, *Armendariz*, 24 Cal. 4th at 99-100 (indicating that an agreement to arbitrate a statutory claim "'does not forgo the substantive rights afforded by the statute [but] only submits to their resolution in an arbitral . . . forum'"). Here, Plaintiffs have asserted unwaivable statutory rights, including under the CLRA.

Nevertheless, even if *Gutierrez* governs, and the Court evaluates whether, at the time of the admission agreements, it would have been unconscionable to impose cost-splitting on Plaintiffs, *see Gutierrez*, 114 Cal. App. at 91 (noting that "[u]nconscionability is determined as of the time the contract is made"), Defendants would not prevail. Plaintiffs have provided evidence that a two-day arbitration can cost as much as $18,000. *See* Reiten Decl. ¶ 8. Defendants have not argued that this is not a representative example of the cost of arbitration. Even at a 1/7 pro rata

11

1  share (as there are two Plaintiffs and five Defendants),[4] each Plaintiff could pay as much as $2,500
2  – and that would be for a two-day arbitration only.  Plaintiffs' declarations do not reflect directly
3  on what their financial status was at the time of the admission agreements but, given their current
4  financial situation, *see* Burgoon Decl. ¶ 21 (stating that he is currently paid an hourly wage of $15,
5  has about $5,000 in savings, and has approximately $10,000 in hospital debt); Landers Decl. ¶ 17
6  (stating that he has $1.50 in his checking account, has no savings, and has approximately $20,000
7  in hospital debt), it is a fair inference that Plaintiffs would not have been appreciably better off
8  financially at the time of the admission agreements.[5]  Furthermore, Defendants' contention that
9  Plaintiffs' family members actually paid for the treatment – and not Plaintiffs themselves –
10 suggests that Plaintiffs were not financially able to pay at the time.

   For the foregoing reasons, the Court finds both procedural and substantive
unconscionability.  However, as the Court previously stated, that is not enough to defeat
arbitration because the substantive provisions are all capable of being severed.  *See* Docket No. 63
(Order at 20).

   Mr. Landers protests still that he at least cannot be compelled to arbitration because he did
not initial the specific arbitration provision.  The Court is not persuaded.  Although he did not
initial the specific arbitration provision, he did sign the admission agreement.  Mr. Landers's
failure to initial the arbitration provision may be probative of procedural unconscionability but it is
not enough, in and of itself, to show that Mr. Landers did not enter into the contract given his
signature at the end of the document.  *See Anderson v. Pitney Bowes, Inc.*, No. C 04-4808 SBA,
2005 U.S. Dist. LEXIS 37662, at *4, 11 & n.7 (N.D. Cal. May 4, 2005) (noting that plaintiff did
not initial arbitration provision but did sign the signature line at the end of the agreement; stating
that "[w]hatever significance his failure to initial may have on the arbitrator's decision regarding
the Agreement's enforceability, it does not impact the Court's determination that a contract to

---

[4] The Court notes, however, that Mr. Landers's agreement at least contemplates the parties splitting the cost of arbitration in "half."  Farnsworth Decl., Ex. 1 (Agreement at 12).

[5] To the extent Defendants argue that the cost-splitting provision is not unconscionable because it would get displaced by the cost provisions of the CLRA, that is more a severance point rather than an unconscionability point.

12

arbitrate between the parties exists"); *cf. Hartung v. J.D. Byrider, Inc.*, No. 1:08-cv-00960-AWI-GSA, 2008 U.S. Dist. LEXIS 86972, at *4, 17-18 (E.D. Cal. Oct. 16, 2008) (noting that, even though plaintiff did not initial the arbitration provision in the contract, she did sign the contract; plaintiff also initialed and signed her understanding that the contract contained an arbitration provision in a companion document to the contract). Plaintiffs have not cited any authority to the contrary.

Accordingly, the Court hereby **GRANTS** in part and **DENIES** in part Defendants' motions to compel arbitration. The entirety of Mr. Landers's case shall be arbitrated. Mr. Burgoon's claims against NNC shall also be arbitrated, but not his claims against the higher-up Narconon companies (*i.e.*, Western, International, and ABLE). *See* Docket No. 63 (Order at 23) (concluding that higher-up Narconon companies could not use equitable estoppel to get the benefit of an arbitration agreement to which they were not signatories).

While Mr. Burgoon's claims against the higher-up Narconon companies shall not be subject to arbitration, the Court, in its discretion, **STAYS** all proceedings on those claims because of the claims that will be arbitrated (including Mr. Landers's claims against the higher-up Narconon companies). To the extent the higher-up Narconon companies have asked for dismissal of Mr. Burgoon's claims (all Defendants have moved to dismiss both Mr. Burgoon and Mr. Landers's claims), that motion is **DENIED** without prejudice based on the arbitration as well. It is more than likely that the same argument made in their motion to dismiss will be presented to the arbitrator.

## IV.  CONCLUSION

For the foregoing reasons, the Court rules as follows.

(1)     Defendants' motion to dismiss for lack of standing is denied without prejudice.

(2)     Both Plaintiffs had the mental capacity to enter into the admission agreements and were not unduly influenced to enter into the agreements.

(3)     Defendants' motion to compel arbitration is granted in part and stayed in part. All claims shall be arbitrated except Mr. Burgoon's claims against the higher-up Narconon companies. Litigation on these latter claims, however, shall be stayed pending arbitration. All of Mr.

13

1  Landers's claims shall be arbitrated.  The unconscionable terms are severed.

2      (4)    Defendants' motion to dismiss is denied without prejudice.

3  This order disposes of Docket Nos. 25 and 27.

5  **IT IS SO ORDERED**.

7  Dated: January 15, 2016

_____
EDWARD M. CHEN
United States District Judge